In the Matter of the Proceedings Against OSCAR B. ELAM.—No. 40164.
—211 S. W. (2d) 710.

Court en Banc, April 12, 1948.

Rehearing Denied, May 27, 1948.

*Oscar B. Elam* pro se.

*John B. Pew* and *Irvin Fane* for Circuit Bar Committee for The Sixteenth Judicial Circuit of Missouri.

[710] ELLISON, J.—This proceeding was instituted directly in this court by leave, under Rule 5.03, on an information filed by the members of the Circuit Bar Committee of the Sixteenth Judicial Circuit (Jackson County) charging the respondent Oscar B. Elam, a lawyer who resides and offices in that circuit, with professional misconduct in violation of Rules 4.01, 4.06 and 4.17 of the Canons of Ethics adopted by this court  The information prays that if upon a hearing the respondent be found guilty, a judgment be rendered assessing such penalty or punishment under Rule 5.10 as shall seem proper.  Under that rule the disciplinary action may be either a reprimand, suspension from the practice for a designated time, or permanent disbarment.  This court appointed Hon. Frank Hollingsworth, Judge of the Eleventh Judicial Circuit, as Special Commissioner to take the evidence and make report to this court of his find-

ings of fact and conclusions of law. His report has been of great assistance in elucidating a long and involved record.

The charges against Mr. Elam grow out of a suit he brought in the circuit court of [711] Platte County in 1944 for Mrs. Stacy Henderson and her sister Mrs. Minerva Crilly, as plaintiffs, against their insane brother Beauregard Brown, to partition a residence property in Weston, Platte County, owned by those three parties as tenants in common. A dispute arose between some of the parties and respondent Elam on the charge that he was attempting by contract to effect a partition sale of the property to James E. Bovard, who officed with him, at a price less than it was worth. At the sale Bovard was forced by competitive bidding to pay more than respondent's contemplated sale price.

Thereafter respondent Elam, claiming to represent both the two plaintiffs and Bovard, endeavored to have the latter substituted as plaintiff for the former in the partition suit, and Bovard's bid price rebated to the contemplated contract sale price. Motions of a similar nature followed. At hearings in May and August, 1945, the trial judge intervened and enforced the bid price and wrote the final decree. At those hearings respondent Elam used intemperate language referring to opposing counsel and addressed to the court. The same was true of certain motions or pleadings filed by him. He further brought a $60,000 libel suit against the trial judge, as hereafter explained. The charges against him are that: (1) his attitude and conduct toward the trial court were disrespectful, in violation of Canon 4.01; that he represented conflicting interests and deserted his original clients, the two plaintiffs, in violation of Canon 4.06; that he engaged in personalities and made false charges, in the nature of personal attacks on opposing counsel, both orally and in pleadings, in violation of Canon 4.17. All these were sustained by the Special Commissioner's report, in whole or in part.

Respondent Elam is now 78 years old. He has briefed the case and argued it here. He has furthermore filed a motion to strike 18 exhibits from the transcript on the grounds that they were irrelevant or not presented below, or on other grounds. This motion also asks that 70 different parts of the Special Commissioner's 43 page typewritten report be stricken for various reasons. His original brief is long and he has filed two additional briefs along with a motion that certain original testimony in the trial court files be sent here. We cannot extend this opinion to discuss the facts, objections to evidence and the law, at such length as respondent has done. Neither can we rule on the merits of the partition suit; the question is on respondent's professional conduct.

The record facts, condensed as much as possible, are as follows. The plaintiffs in the partition suit, Stacy Henderson and Minerva Crilly, respectively were 79 and 83 years old when they died on June

20 and May 8, 1945, about a year after the suit was filed. These two sisters lived together in Leavenworth, Kansas. Their brother Beauregard Brown had for many years been insane and an inmate of an asylum in Kansas. Mrs. Crilly was the dominating member of the family, but she was adjudged insane by a Kansas Court on May 17, 1944, after the partition suit was brought. She remained under that disability for about three months until she was "restored" by the same court on August 22, 1944. Mr. Elam had a part in the latter proceeding. She had a stepson Elof Crilly, a merchant in Kansas City, who testified before the Special Commissioner that she was "just as good, as brainy as a man," except when under the influence of codeine prescribed by her physician. While cross-examining Crilly Mr. Elam stated twice that he doubted whether any contract Mrs. Crilly had made in a year (or years) could be enforced. But he declared he considered her sane. Apparently he thought the medicine produced her mental condition.

Respondent Elam's connection with the whole transaction began when Mrs. Crilly's stepson Elof employed him in April, 1944. She had listed the residence property with a real estate agent in Weston named Foley to be sold for $1250, and Foley had obtained a contract purchaser named Conard at that price. Likewise, Mrs. Crilly and her sister had executed and delivered to Foley a warranty deed of the property with the name of the grantor omitted. The consideration named in the deed was "other valuable considerations & No/100 Dollars." [712] Two days later Elof Crilly and respondent Elam went to Weston on April 13, 1944, and induced Foley to rescind his brokerage contract and to surrender the deed, on the theory that the interest of the insane and non-signing tenant in common, Beauregard Brown, could not be conveyed by the deed. At a conference at the home of Mrs. Crilly in Leavenworth that same day, it was returned to her, but she entrusted it to Elam, who kept it thereafter. He suggested the best way to pass the whole title would be by bringing a partition suit, in which his fee could be taxed as costs. Elof Crilly testified that Elam said he thought the property ought to be worth $2500, inasmuch as the mother of the parties had paid that for it in 1917; and that he (Elof) and Elam agreed on a price of $1800.

Respondent Elam filed the partition suit on May 5, 1944. Prior thereto he talked to John J. Coull, a member of the Kansas City bar 78 years old, about serving as attorney for Elof Crilly, who was to be guardian ad litem for the insane defendant Beauregard Brown in that suit. On September 4 Crilly was so appointed by the court and Coull filed an answer for him which had been prepared by Elam, stating the petition ought to be granted. Two days later the cause was heard, and an interlocutory decree entered ordering a partition sale.

Coull testified that Elam talked to him about the value of the property, and proposed that they buy it, which latter Elam denied.

For the previous six months or so James E. Bovard had worked in Elam's office in Kansas City typing and serving legal papers. He was 76 years old and stone deaf. But he was soon to come into an inheritance of $6000, and Elam was handling certain legal matters for him. On September 23, 1944, a little over two weeks after the interlocutory decree had been rendered, Elam wrote in longhand and presented to the two old ladies for their signatures a letter addressed to Bovard, in which it was stated that Elam had informed them Bovard had offered $1250 for the property under partition; and that they would sell their two-thirds interest therein to him for $500 per share, on the basis of $1500 for the whole title but leaving outstanding the remaining share of the insane defendant Beauregard Brown, subject to the payment of the costs in the partition suit. The two women signed that letter. On the same day Elam wrote a longhand letter addressed to them and signed by Bovard, accepting their offer if they would reduce the price of the property to $1375, Bovard to make a down payment of $200, and the court costs to be deducted from the $1375. Elam indorsed a longhand acceptance of that counter-offer on the bottom of Bovard's letter and the two women signed it. All this was done in Mrs. Crilly's home, with Elam and Bovard there in conference, as we understand, Elof Crilly, the guardian ad litem of Beauregard Brown, and Coull, his attorney, were not present.

That fall Coull, attorney for the guardian ad litem, went to Weston and investigated the value of the property. He reached the conclusion that it would sell for $3000 to $3500 if the partition sale were postponed until the next spring when the tobacco market at Weston was active, and so told Elam. Thereafter, Coull filed a motion in the partition suit that the property be appraised before the sale. He served a copy of that motion on Elam but the latter refused to accept service of it. But on November 27, 1944, the court postponed the sale to the spring (March) term. It was held on March 12, 1945, Elam, Bovard, Coull and Elof Crilly being present. The latter made the first bid of $1800; Elam bid $1825; Crilly $1850; and Elam $1875. The property was sold to Bovard for that price. Elam testified he was representing Bovard in the bidding, because the latter was deaf; and that he kept Bovard apprised of Crilly's bids by writing them down.

On that same day Elam, as attorney for Bovard, filed a petition in the circuit court praying that Bovard be made plaintiff in the partition suit, on the ground that he had purchased the interests of the two old ladies in the property under the letter-contract summarized in the second preceding paragraph. Three days later, on March 15, he filed a joint "Statement of Plaintiffs and James E. Bovard," signed by him (Elam) as attorney for all three of those

[713] parties, stating that the two women had no interest in the property because of the aforesaid letter-contract they had made with Bovard and the fact that pursuant thereto he had paid them $200. A copy of the letter-contract was attached to the pleading, along with an attestation of its truth signed by all three of the parties.

With the record standing in that shape, the cause was taken up by the court on May 5, 1945, on the papers filed and the sheriff's report of sale. There appear to have been two hearings that day: one called a "conference" in the jury room; and later another in open court. The court reporter did not transcribe the proceedings in the conference but did those in open court. Respondent contends that whatever he may have said or done in the conference is immaterial in the instant disciplinary proceeding because in the conference the trial judge was not sitting judicially. There are many things an attorney might do outside the court room that would make him subject to disbarment. And this court has ruled that court proceedings held outside the court room are not extra-jurisdictional, State ex rel. Green v. James, 355 Mo. 223, 228 (2, 3), 195 S. W. (2d) 669, 677 (2, 3).

Nevertheless we shall not base our findings on what occurred during the conference except insofar as it may be reinforced by what is shown to have occurred in open court. When the court came back to the court room after the conference, it appears from the reported proceedings that the trial judge, Judge Bridgeman, had made up his mind to overrule the pleadings Mr. Elam had filed asking that Bovard be substituted as plaintiff for the two women and that Bovard's contract price of $1375 be permitted to stand against Elof Crilly's bid price of $1875. In fact, Judge Bridgeman testified in the hearing before the Special Commissioner that he told Mr. Elam he thought the latter "had overstepped the old ladies." There are also indications that the judge had doubt as to Mrs. Crilly's mental competence and as to Mr. Elam's fidelity to her. One of the first things the judge said was that he wanted "that motion you introduced in evidence" considered in evidence. It was a motion that Elam apparently had produced but withdrawn at the conference, in which he had asked that Bovard be refunded $500 from the $1875 he had bid, thus reinstating his contract price of $1375. It actually was not inserted in the record until a later session of court on August 20, and was drawn on the theory that Elof Crilly, the competitive bidder, was only a straw man to force up the bidding.

At the court session of May 5, 1945, after the "conference" the court announced it was going to overrule that motion if it had not been withdrawn, and then Elam called up his petition to substitute Bovard as plaintiff in the place of the two women. The court ordered it marked as an exhibit. Elam retorted that it was not "a plaintiff's exhibit" and the judge answered that "the court is offering it." Then he said "The court can offer it as plaintiff's exhibit. He can

put it in if he wants to, but that don't make it plaintiff's exhibit." Then the court ordered this motion to refund $500 to Bovard marked as "Exhibit No. 1," and Elam said it was "not plaintiff's exhibit," whereupon the court ordered it marked "Court's Exhibit." From there on most of the discussion was about receipts and disbursements on the property, such as rent, taxes, etc.

The real estate agent, Foley, testified and identified the blank (as to grantee) deed he had surrendered to Elam, and Elam offered it as an exhibit. The court said "Well that deed never was intended to go to Mr. Bovard, was it?" Elam answered "No", but said he contended Bovard had it "before him" and that it was "made from them to him as an endorsement." Then the court asked where Mr. Bovard got that instrument. Elam answered, evasively we think, that Bovard had investigated the property and the title. Being asked "who drew these instruments" and "where did Mr. Bovard get this deed here," Elam answered "There is no special place for him to get those excepting from the abstractor." Then the court replied "Well that never was in the abstract," and asked "You made that deed didn't you" to which Elam replied "Certainly, I did, yes, sir." The court then inquired "Well, why don't you answer my question then?" And [714] Elam answered, "Well, I—why don't you ask a straight question?" And the court replied, "Well I did three times."

Continuing the examination in open court of the witness Foley, Mr. Elam said his purpose was to refute the "behind the curtains" claim that Bovard was trying to get the property for an "inferior" price ($1375); and Foley did testify the $1250 price for which he had sold it was the best he could get at the time. Coull, the attorney for the guardian ad litem, interjected that after "they had a sale ready to get the cash ($1800) this man (referring to Elam or Bovard) comes up there and breaks it up" (by the contract with the two old ladies) and tried to take the property for $1375. Several pages further on Elam said "This *sneak* (referring to Coull) has come in here by insinuation directing charges to the court;" and that if Coull were worth a dime he (Elam) "would go after him for it." Then the court intervened and said the case must be tried without personalities "between you gentlemen," and that Elam had been unkind enough to call Coull a liar (perhaps in the "conference") and that if he did it again he would be fined. Elam did not deny that, but said the "condition was so unprecedented in my experience."

It was afterwards in the same open court session that Elam said he doubted if any contract Mrs. Crilly had made in a year (once he said "in years") could be enforced, but he nevertheless asserted she was "a good, keen-minded woman in the oil business and things like that." Following that the court inquired again as to the receipts and disbursements since the property had been in dispute and the costs, fees and expenses arising from the transaction and litigation,

and announced it would endeavor to treat the partition sale to Bovard as valid at the $1875 price, and would refund to Bovard the $200 he had paid the two old ladies.. It was further announced the court would overrule all motions and write the decree making allowances for the foregoing detailed items. Coull said that would be satisfactory to him. Elam did not expressly agree, but did not dissent, and suggested another item that ought to go into the accounting. However, Judge Bridgeman testified that after Elam had talked to Bovard he approved the foregoing disposition of the matter. The court said it would send a copy of the decree "to you", meaning the attorneys on both sides, and the hearing was recessed until the further order of the court. This is a high point in the Bar Committee's case.

Judge Bridgeman testified that after the hearing on May 5 he prepared and on May 12 mailed copies of the decree to Elam and Coull, and to the circuit clerk with directions to file as of May 5, 1945, which was done. Coull received his copy about May 13 and approved and mailed it to the circuit clerk. Mr. Elam said he never received his copy, and that as late as May 16 the court record failed to show the decree had been filed. On May 20 he mailed to the recorder of deeds of Platte County, for recording, the deed to the property obtained from the real estate agent Foley, in which the grantee's name had been omitted. But he inserted James E. Bovard's name therein as grantee, and stated in his letter that he had been authorized by the makers to do it. He also sent copies of that letter to Judge Bridgeman and the sheriff.

Thereafter, on June 9, 1945, respondent Elam wrote identical letters to Judge Bridgeman, the sheriff and circuit clerk, enclosing two motions. The first was to substitute Bovard as plaintiff in the place of the two old ladies, with suggested record entries. The second was to strike out "as fraudulent and void a certain instrument purporting to bear the signature of John J. Coull as attorney . . . ;" and to expunge from the records of this court "the copy of said instrument appearing in said record." Then the motion described the "instrument", not by naming it, but by quoting its beginning and ending. It was Judge Bridgeman's final decree with Coull's approval endorsed thereon. The motion alleged the instrument was "conceived in fraud and brought forth in iniquity and is not truthful in its statements and constitutes an actionable libel against its sponsors"; and that "if the sheriff should be misled by such entry and disburse any money thereunder he would thereby breach his bond."

[715] On June 15, 1945 Elam filed two more motions in the name of Bovard as successor to the original plaintiffs "for the purpose of clearing the record of frivilous papers." Both motions challenged Coull's right to appear in the case as attorney for the guardian ad litem, Elof Crilly, on specified legal grounds. On June 21 he filed a five page "Discussion . . . on pending questions in this case."

And on August 20 he filed a motion to refund to Bovard $500 of his $1875 bid price on the residence property, which was similar to the one he had withdrawn at the "conference" on May 5, 1945. Likewise on August 20 he filed suggestions of the death of the original plaintiffs, Minerva Crilly on May 8, and Stacy Henderson on June 20, 1945, and the appointment of a Kansas administrator for them. The suggestions again prayed that Bovard be substituted as plaintiff in their stead.

The final session of court was held on that same day, August 20, Judge Bridgeman presiding. Only Coull and Elam were there. Both were sworn as witnesses. The entire proceeding consisted mainly of a dialogue between respondent Elam and the court. Elam sought to bring up five different pleadings he had theretofore filed, particularly the joint Statement of the two plaintiffs and Bovard which had been filed March 15, 1945, in which the former disclaimed any interest in the residence property because of their letter-contract with Bovard; and also Bovard's motion to have $500 of his $1875 bid price refunded to him. The court said these pleadings had been overruled at the court session on May 5, and that Elam had agreed to it at that time, before the final decree had been written. Elam denied it; said that session was a mere "informal discussion"; and that no final decree had ever been rendered.

There was an animated controversy about the ethics of Elam's representing the two old ladies and Bovard at the same time. The court told Elam he had "turned turtle" on the ladies. Elam asserted it was proper because the three parties had agreed to it. He said Bovard had written the two plaintiffs offering to rescind the contract of sale to him, but they refused; and that he had given that letter to Judge Bridgeman. But Judge Bridgeman could not remember it. (At some date after the session Elam delivered to the court reporter a copy of that letter, dated November 14, 1944, and it is copied in the transcript.) Elam also asserted the Kansas guardian of Beauregard Brown and the probate judge told him they preferred the private sale to Bovard. Finally he asked that Judge Bridgeman be sworn as a witness, which was done, whereupon Elam objected to his testifying and said, "Now I am going to object and shut you up." He insisted that before Judge Bridgeman could testify he must call in another judge, and said "I have got you stopped." At least twice he referred to the final decree as a "phony instrument," and once as a "fake decree." And in effect he accused Judge Bridgeman of entrapping him by delaying the filing of the final decree so long after the session of May 5 that the time for appeal had lapsed. There was also counter-testimony from Coull, but we cannot burden this opinion with it. The final ruling of the court at the session on August 20 was to overrule all motions filed by respondent Elam and to uphold the decree as rendered on May 5.

Turning away from the court proceedings in the partition suit, to the hearing before the Special Commissioner in the instant disciplinary proceeding. Mr. Elam (then represented by counsel) testified at great length. We shall only sketch his testimony. He said Mrs. Crilly's stepson Elof in the beginning was willing for Bovard to buy the residence property and took him to see it; and that the old ladies said Elof had told them about Bovard, and wanted to get him interested. Elam denied agreeing on $1800 as the price of the property. He said the old ladies, Crilly and Bovard all fully understood he was representing both sides in the transaction. He denied calling Coull a liar in the conference or court session on May 5, but conceded he might have called him a *snitch*. He said Coull was trying to get him (Elam discharged and to take over the partition suit; and that Coull threatened to sue the old ladies in behalf of the insane defendant Beauregard Brown for one-third the rent collected for 22 years on the [716] Weston residence property. He narrated that the old ladies were indignant when they learned Elof had bid $1875 for the property at the partition sale, and said he had no money. He declared that *Mrs. Crilly* was the one who wanted to join in a petition that Bovard be substituted—as plaintiff.

Other scattered bits of Elam's testimony were as follows. He said he had no authority from Bovard to consent at the court session on May 5, 1945, to the rescission of Bovard's letter-contract for the purchase of the property for $1375. He further said he filled in the name of Bovard as purchaser in the deed obtained from Foley because Mrs. Crilly wanted that done; also because it imparted notice to the sheriff, who was holding Bovard's $1875 bid money; and because the deed would pass the old ladies' equitable rights in the land. And notwithstanding the reporter's transcript of what the court had said at the court session on May 5, as heretofore narrated, Mr. Elam insisted he did not agree the court should write the final decree on the basis of a partition sale to Bovard at $1875 with a refund of the $200 he had paid the two old ladies, and an accounting of costs, fees and expenses. He said the court merely promised to send a draft of the decree to him for "criticism", and that he never received it.

With respect to his business relations with the two old ladies, Mr. Elam said he visited them at Leavenworth a number of times. Aside from his earlier visits, he went there the evening of March 12, 1945, after the partition sale was held, and reported to them that Elof Crilly had forced Bovard to bid up to $1875. On the same day he had filed the petition to have Bovard substituted for them as plaintiff. Three days later on March 15 he filed the joint Statement in which the two women disclaimed title in the property because of their letter-contract with Bovard. He had been to see Mrs. Crilly on the evenings of May 4 and 5, and said she "was as usual." She was in

a hospital at that time and died three days later on May 8. But in the meantime Mr. Elam had attended the court session on May 5, and urged the aforesaid two motions he had filed. And after Mrs. Crilly's death he had recorded the deed and filed four motions and a brief without any suggestion of her death until August 20.

His frequent visits may be partially accounted for by the fact that he had other business for them. He said once he had written Mrs. Crilly's will and that Mrs. Henderson didn't make a will. Another time he said the arrangement was that the *surviving* sister would get all the property-indicating reciprocal wills. At the request of Elof Crilly, he said, he had searched the probate records in Leavenworth to see if the family had an interest in some estate. Likewise he had taken part in the probate proceedings in Leavenworth when Mrs. Crilly was discharged as an insane person. And toward the end of his cross-examination he volunteered the statement that about November 17, 1944, the two old ladies wanted to pay him for all he had done, and Mrs. Crilly asked if he would accept their interest in the Weston property under the Bovard contract, as a "credit" on what they owed him—which he did—so they really didn't have any financial interest in the partition sale money anyway.

About seven months after the August 20 session of the Platte county circuit court, Mr. Elam filed a suit for Bovard in the Jackson County circuit court against Judge Bridgeman and attorney Coull, in which the amended petition prayed $60,000 damages and was entitled "Damages—Spoilation of Circuit Court Record—Falsification of said Record—Libel—Malicious—Defamation—Extortion—Blackmail." The basis for the suit was the filing of the allegedly "false" and "spurious" final decree in the partition suit, and the spreading thereof upon the records of the Platte County circuit court. This suit was dismssed by the Jackson County circuit court on motion of the defendants on April 19, 1946. Respondent Elam has presented citations[1] [717] that such a suit would lie, on the theory that Judge Bridgeman acted wholly without jurisdiction in filing the decree.

Turning now to the law side of the instant proceeding, we hold, first, that respondent Elam's citations just given[1] are not in point for the reason that Judge Bridgeman did have jurisdiction of the partition suit in Platte County; that he had jurisdiction to file the final decree; and that there was no factual basis for the damage suit in Jackson County; all as will be explained presently.

Next, respondent contends that in the hearing on August 20, after Judge Bridgeman took the oath as a witness he lost jurisdiction to sit in the partition suit; that it was his duty to call in another judge; that he occupied the status of a witness; and that he (re-

[1]Sec. 4454, R. S. 1939-Mo. R. S. A.; Cooley on Torts (Student's Ed.), p. 379, sec. 210; Manning v. Ketcham, 58 Fed. (2d) 948 (2, 3); Sandrowski v. Sandrowski, 230 Mo. App. 1056, 93 S. W. (2d) 81.

spondent Elam) as attorney for the plaintiffs and Bovard, had the right to tell him (Bridgeman) he was going to "shut you up" and that "I have got you stopped." On that point respondent Elam relies on the authorities cited below.[2] Other more general authorities on the question appear below.[3] The majority rule is that it is improper for a trial judge to leave the bench and take the stand as a witness in the case before him on controverted matters, especially in a single judge court. However he does not thereby lose jurisdiction, though it may be ground for reversal if objection is made: but not if the objecting party consented below. The New York case cited by respondent so holds. In the Kansas case the judge did not testify but was merely a competent witness, and the question arose on an application for change of venue. In the other cited cases the judge either volunteered as a witness or was put on the stand by a party adversary to the objecting party.

There are two answers to respondent's contentions. First, he was the one who *asked* that Judge Bridgeman be sworn as a witness; and by that devise entrapped him, actually stating he had got him shut up. The other reason is that the judge as the administrative officer of the court had a right to take cognizance of respondent's acquiescence in the writing of the final decree in the partition suit by the court. Judge Bridgeman did not need to be sworn as a witness, and should not have submitted to it. He was entitled to act on what he saw and heard counsel, the parties, the witnesses—and others—do and say in the court room as a part of or affecting the trial. And aside from the administrative aspects of such matters, it was akin to what the late Dean Wigmore called Autopic Proference, 4 Wigmore on Evidence, supra,[3] l. c. p. 242.

On what we may call the "merits" of the disbarment proceeding respondent Elam has cited a great number of decisions: (1) defining a sham pleading as one "good in form but false in fact; (2) holding the evidence must be within the pleadings; (3) and that the judgment must be within both. Thence respondent reasons that the written and oral evidence irrefutably sustains his contention that the two plaintiffs, Mrs. Henderson and Mrs. Crilly, contracted to sell their interest in the Weston residence property to Bovard for $1375 less costs, and that the Platte County circuit court had no jurisdiction to decree otherwise.

---

[2] Gray v. Crockett, 35 Kan. 66, 71, 10 Pac. 452, 455; Terrell v. U. S. (C. C. A.), 6 Fed. (2d) 498, 499(2); State v. Sandquist, 146 Minn. 322, 323, 178 N. W. 883; State v. De Maio, 69 N. J. L. 590, 592, 55 Atl. 644; People v. Dohring, 59 N. Y. 374 et seq.; Ross v. Buhler (La.) 2 Mart. (N. S.) 312; Maitland v. Zanga, 14 Wash. 92, 94, 44 Pac. 117.

[3] 6 Wigmore on Evidence (3 Ed.), p. 586, sec. 1909; 4 ibid., pp. 237-242, secs. 1150-1152; 70 C. J., p. 180, sec. 237; 48 C. J. S., p. 1068, sec. 83b; 33 C. J., p. 1011, sec. 173; 28 R. C. L., p. 468, sec. 56.

But respondent Elam ignores the evidence that he had agreed the property under partition was worth $1800; that after investigation Coull and Elof Crilly had thought it was worth more; that his client Mrs. Crilly had been "restored" to sanity only a month before her letter-contract was made on September 23, 1944, in the absence of Coull and Elof Crilly; that she had been a drug addict for such length of time that he (Elam), himself twice said he doubted if any contract she had made in a year (once he said years) could be enforced; [718] that both Mrs. Henderson and Mrs. Crilly were old, cloistered, and needed disinterested advice from him, regardless of whether they voluntarily agreed to the letter-contract or not; and that at best the contract betrayed the interest of their insane brother in the property. In addition, the reporter's transcript report of the court session on May 5 strongly tends to corroborate Judge Bridgeman's testimony that respondent agreed the court should write the final decree approving the partition sale to Bovard for $1875, less the $200 he had paid the two old ladies, and the costs, fees and expenses attendant upon the proceeding. We so find the facts to be. If Elam's plan had not miscarried, he would have got all of the two old ladies' shares of the net partition proceeds, plus his attorney fee therein; and his office associate Bovard would have got the property for $1375. And he admits he called the attorney Coull a snitch.

Since the submission of this cause, respondent Elam has filed a motion to require petitioners to produce an original letter allegedly written by him to Stacy Henderson and Minerva Crilly and countersigned by them, dated November 4, 1944, an alleged copy of which was handed by respondent Elam to the court reporter after the trial of the partition suit had been concluded, and which appears in the transcript at pages 637, 638. The motion further asks for the production of the alleged testimony of the deaf witness James E. Bovard in said partition suit, this being in the form of typewritten questions with the answers of the witness written by him in longhand. It appears the original documents have been lost. But we already have a copy of the questions, indicating the nature of the answers elicited, and respondent's comments thereon. With this motion come further repetitious suggestions.

The motion is overruled for the reason that even if this evidence be assumed to be true and competent in the partition suit, it does not excuse respondent's misconduct under review in this disbarment proceeding. This opinion is written on the assumption that the two old ladies did contract to sell the Weston residence property to Bovard for $1375 less costs, and later elected by the above letter to reject Bovard's bid price of $1875. It is the conduct of respondent Elam in assisting them to those conclusions, along with his conduct in court and afterward, which is under review here.

■ We find that respondent Elam violated Sections 4.01, 4.06 and 4.17 of the Code of Ethics, in that: (1) his attitude and conduct toward the trial court were flagrantly disrespectful; (2) that he represented conflicting interests in the partition suit; (3) that he engaged in personalities and made false charges in the nature of personal attacks on opposing counsel. His motions to quash the information and to strike out exhibits are overruled. Considering all the facts disclosed by the record, it is the judgment of the court that he should be and hereby is disbarred from the practice of law in this state. All concur.